IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM JOHN COATES,

        Petitioner,           No. CIV S-09-3499 GGH P

    vs.

R. GROUNDS,

                      ORDER

        Respondent.

_____/

I. Introduction

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This case is before the undersigned pursuant to both parties consent. Docs. 7, 8.

        Petitioner challenges his 2007 conviction for continuous sexual abuse of a child under 14 and a lewd act upon a 14 year-old child. Petitioner was found to have a prior strike conviction and sentenced to 24 years in prison. This action is proceeding on the original petition filed December 18, 2009, raising the following claims: 1) Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence was improperly admitted; 2) California Evidence Code § 1108 violates due process and is unconstitutional and the trial court abused its discretion in permitting the introduction of prior sexual offenses pursuant to § 1108; 3) improper jury instructions; and 4)

1   the trial courts abused its discretion in denying petitioner's motion to dismiss a prior strike.[1]

2         After carefully considering the record, the court orders that the petition be denied.

3   II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

4         The Anti-Terrorism and Effective Death Penalty Act (AEDPA) "worked

5   substantial changes to the law of habeas corpus," establishing more deferential standards of

6   review to be used by a federal habeas court in assessing a state court's adjudication of a criminal

7   defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir.

8   1997).

9         In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

10  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

11  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

12  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

13  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

14  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

15  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

16  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

17        "Unreasonable application" of established law, on the other hand, applies to

18  mixed questions of law and fact, that is, the application of law to fact where there are no factually

19  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

20  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

21  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

22  deference is not blindly automatic, "the most important point is that an *unreasonable* application

23  of federal law is different from an incorrect application of law....[A] federal habeas court may not

24  issue the writ simply because that court concludes in its independent judgment that the relevant

25  _____

26      [1] The instant petition is merely a copy of the petition presented to the California Supreme Court.

1    state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

2    that application must also be unreasonable."  <u>Williams (Terry)</u>, 529 U.S. at 410-11, 120 S. Ct. at

3    1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

4    objectively unreasonable nature of the state court decision in light of controlling Supreme Court

5    authority.  <u>Woodford v. Viscotti</u>, 537 U.S. 19, 123 S. Ct. 357 (2002).

6            The undersigned pauses here to especially recognize that the AEDPA standards

7    are purposefully difficult for any petitioner who desires to overturn his/her conviction.  The

8    Supreme Court has only recently emphasized in the strongest terms that state court convictions

9    will not be overturned unless there is no reasonable support, either legal or factual, for the

10    determinations of the state courts.

11          Under § 2254(d), a habeas court must determine what arguments or theories
              supported or, as here, could have supported, the state court's decision; and
12          then it must ask whether it is possible fairminded jurists could disagree that
              those arguments or theories are inconsistent with the holding in a prior
13          decision of this Court.
                                       ***
14

15          As a condition for obtaining habeas corpus from a federal court, a state
              prisoner must show that the state court's ruling on the claim being presented in
16          federal court was so lacking in justification that there was an error well
              understood and comprehended in existing law beyond any possibility for
17          fairminded disagreement.

18    <u>Harrington v. Richter</u>,__U.S.__, __S.Ct.__, 2011 WL 148587 (2011)

19            The undersigned also finds that the same deference is paid to the factual

20    determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are

21    presumed to be correct subject only to a review of the record which demonstrates that the factual

22    finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

23    light of the evidence presented in the state court proceeding."  It makes no sense to interpret

24    "unreasonable" in §2254(d)(2) in a manner different from as that same word appears in §

25    2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

26    same record could not abide by the state court factual determination.  A petitioner must show

1   clearly and convincingly that the factual determination is unreasonable.  See Rice v.Collins, 546

2   U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

3          "Clearly established" law is law that has been "squarely addressed" by the United

4   States Supreme Court.  Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).

5   Thus, extrapolations of settled law to unique situations will not qualify as clearly established.

6   See e.g., Carey v. Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not

7   permitting state sponsored practices to inject bias into a criminal proceeding by compelling a

8   defendant to wear prison clothing or by unnecessary showing of uniformed guards does not

9   qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

10         The state courts need not have cited to federal authority, or even have indicated

11  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

12  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

13  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

14  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

15  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

16  established Supreme Court authority reviewed must be a pronouncement on constitutional

17  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

18  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

19         However, where the state courts have not addressed the constitutional issue in

20  dispute in any reasoned opinion, the federal court will independently review the record in

21  adjudication of that issue.  "Independent review of the record is not de novo review of the

22  constitutional issue, but rather, the only method by which we can determine whether a silent state

23  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

24  2003).

25  III.  Background

26         The opinion of the California court of appeal contains a factual summary that the

4

court adopts below.

The minor victim, B.G, was born in 1990.  During the period in which the offenses were committed, [petitioner] was married to B.G.'s grandmother (Grandmother).  While growing, up B.G spent many nights and afternoons after school at Grandmother's house.

In December 2003, when B.G. was 13 years old, [petitioner] fondled B.G.'s breast while she was lying on a couch and Grandmother was not present.  B.G. could not remember whether this was the first time [petitioner] touched her inappropriately because it happened so often.  He did other things that she was uncomfortable with, such as getting very close and patting her "butt" and commenting on her bra size.

[Petitioner] often gave B.G. back massages, but when he did, if no one else was present, his hands would "find its way to [her] breast or to [her] butt."  She estimated that defendant did this more than 10 times but less than 20.  She also recalled another specific occasion in 2004 when she complained that her cheerleading activity was making her "butt" hurt.  Although she had asked [petitioner] not to rub her butt he did so anyway.

The last time [petitioner] molested B.G. was when she was 14, in November 2004, just before Thanksgiving.  [Petitioner] started giving B.G. a back massage in the kitchen. B.G. said she wanted to lie down, so they moved to the living room.  When B.G. lay down, [petitioner] massaged her back and then moved to her breasts and buttocks.  He put his hands underneath her bra, and made skin to skin contact with her breasts.  When Grandmother came into the room and asked, "What are you doing, Bill?" [petitioner] stopped, and B.G. got up.

B.G. did not tell anyone about the molestation because she did not want to break her family apart.  She was also afraid of how it would affect her grandmother.  On different occasions, Grandmother and B.G.'s mother had asked her if anyone had touched her inappropriately.  B.G. lied when she told them no one had.  After the November 2004 incident she did tell a friend, and the friend's mother told B.G.'s mother.  B.G.'s mother and father then told Grandmother that [petitioner] had been molesting B.G., and had B.G. report the problem to a school resource officer.  Although Grandmother initially was not cooperative, she explained that she was "confused and shocked."  Grandmother later gave the police a statement, and separated from [petitioner] after 27 years of marriage.

Grandmother testified that she was aware of the [petitioner's] prior child molestation conviction.  After that conviction, [petitioner] was placed on probation, and they both went to counseling, where she learned about signs of child abuse.  B.G.'s mother was also aware of the prior conviction, and Grandmother promised that she would not leave B.G. alone with [petitioner].  Grandmother also told B.G. not to let anyone touch her inappropriately, and not to "sit on her grandpa's lap."  When B.G. was at Grandmother's house, Grandmother was with B.G. 95 to 99 percent of the time.

L.A., who was 38 at the time of trial, testified that as a child she spent a lot of time with Grandmother, who is her cousin, and [petitioner].  In 1982 or 1983,

when L.A. was 11 years old, she spent the night sleeping on a couch at their house. [Petitioner] came in and started kissing her and touching her breast. She was "paralyzed with fear." [Petitioner] put his tongue all over L.A.'s face, ears and chest, licking her down to her waist. He did this for about 15 minutes, and then suddenly stopped.

L.A. did not tell anyone because she had heard her mother say that Grandmother was finally happy and had married a good man, and L.A. did not want to be responsible for taking that away from Grandmother. Four years later L.A. came forward when her mother came home, very upset, saying that another cousin, J.P., had accused [petitioner] of touching her inappropriately. Until L.A. came forward, everyone believed that J.P. was lying. After L.A. told her family about what [petitioner] had done, her family stopped associating with these relatives, and L.P. never met B.G.

J.P. was 29 at the time of trial. Grandmother was her aunt. When J.P. was approximately nine years old, she was staying with Grandmother and [petitioner]. When Grandmother was in the bathtub, [petitioner] touched J.P.'s vagina with his fingers. This happened more than once. J.P. reported this conduct to her third grade teacher. J.P. did have contact with her cousin B.G., but did not tell B.G. that [petitioner] had molested her until she learned, in November 2004, that defendant had molested B.G.

Dr. Urquiza, an expert on CSAAS, explained that CSAAS was originally described in an article for therapists of sexually abused children, to dispel misconceptions about child abuse and describe and explain common paradoxical behavior. He testified that CSAAS is an "educational tool to assist treatment," and that it is improper to use it to determine whether a child has been abused, or to determine whether a person is the perpetrator. He testified that the five components of CSAAS are: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed and unconvincing disclosure; and (5) retraction.

Secrecy involves some type of direct or indirect coercion or intimidation that keeps a child from reporting abuse. He explained that the source of coercion or intimidation often arises out of the type of relationship the child has with the abuser, who, contrary to popular belief, is not typically a stranger, but rather is "somebody with whom they have an ongoing relationship." The coercion may take the form of a direct threat, but can also be indirect. The perpetrator may be "bigger or stronger and more in a position of authority," or the child may have witnessed the perpetrator exert power or use force over someone else close to them, and be afraid to make the perpetrator angry. The child may also love the perpetrator and believe the perpetrator or the child will get in trouble if the child reports the abuse.

The helplessness component dispels the misconception that a child will run from, or avoid, a perpetrator. The perpetrator often occupies a position of trust and has control over the child's life and may be responsible for the child's welfare. The child is usually smaller, younger and weaker. Entrapment describes how the child is "stuck" because the child believes he or she cannot tell anyone and cannot do anything to stop it. Accommodation describes the ways a child will cope with the experience of being sexually abused. One way is for the child to disassociate

6

from the unpleasant feeling arising from the abuse so the child can "continue in this experience that they have no control over." If a child learns to cope with the experience they may sustain the relationship with the abuser even though the relationship exposes the child to further the abuse. The child believes he has no choice, and to do otherwise risks that others will discover the abuse.

The delayed and unconvincing disclosure component dispels the misconception that an abused child will promptly report the abuse. Delayed reporting is common, and the unconvincing disclosure element describes the common pattern of "vague and undescriptive" statements or inconsistent or differing statements. The retraction component describes recanting of allegations because of fear, threats, or for other reasons.

Dr. Urquiza also testified that he knew nothing about the particular facts of this case, and had no opinion on the issue of guilt, which he emphasized was a question only for the jury to decide.

For the defense, [petitioner's] daughter-in-law testified that, until November 2004, B.G. was at Grandmother's and [petitioner's] house more often than she was at home. From the age of 10 until Thanksgiving 2004, B.G. constantly badgered [petitioner] for backrubs.

People v. Coates, 2008 WL 4788291 at *1-3.

IV.  Argument & Analysis

      Claim 1 - Child Sexual Abuse Accommodation Syndrome

      Petitioner argues that his constitutional rights were violated by the introduction of evidence regarding Child Sexual Abuse Accommodation Syndrome (CSAAS).[2]

      Legal Standard

      "Habeas relief is available for wrongly admitted evidence only when the questioned evidence renders the trial so fundamentally unfair as to violate federal due process." Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993). See also Larson v. Palmateer, 515 F.3d 1057, 1065 (9th Cir. 2008) (because federal habeas relief is limited to such instances, "[t]he

---

    [2] "CSAAS describes various emotional stages, experienced by sexually abused children, that may explain their sometimes piecemeal and contradictory manner of disclosing abuse. Under the CSAAS analysis, inconsistencies in a child's accounts of abuse do not necessarily mean that the child is lying. The child could be telling different parts of what happened [with] different adults, based on the child's comfort level with each adult or on the developmental immaturity of the child's memory." Brodit v. Cambra, 350 F.3d 985, 991 (9th Cir. 2003).

1 | correctness of the trial court's evidentiary ruling as a matter of state law is irrelevant to our
2 | review[.]"); Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998).  While adherence to state
3 | evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is
4 | certainly possible to have a fair trial even when state standards are violated; conversely, state
5 | procedural and evidentiary rules may countenance processes that do not comport with
6 | fundamental fairness.  Jammal v. Van de Kamp, 926 F.2d 918, 919 (citing Perry v. Rushen, 713
7 | F.2d 1447, 1453 (9th Cir. 1983)).

8 |       The due process inquiry in federal habeas review is whether the admission of
9 | evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  Payne v.
10 | Tennessee, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).  The Supreme Court has
11 | admonished that the category of infractions that violate "fundamental fairness" has been defined
12 | very narrowly.  Estelle, 502 U.S. at 72.  In Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.
13 | 2009), the Ninth Circuit noted the "Supreme Court has made very few rulings regarding the
14 | admission of evidence as a violation of due process.  Although the Court has been clear that a
15 | writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see
16 | Williams[v. Taylor], 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that
17 | admission of irrelevant or overtly prejudicial evidence constitutes a due process violation
18 | sufficient to warrant issuance of the writ."  Id. at 1101.  Thus, a habeas petitioner "bears a heavy
19 | burden in showing a due process violation based on an evidentiary decision."  Boyde v. Brown,
20 | 404 F.3d 1159, 1172 (9th Cir.), amended by 421 F.3d 1154 (9th Cir. 2005).

21 |       Discussion

22 |       This claim was brought on direct appeal and denied in a thorough and reasoned
23 | opinion by the court of appeal.

24 |     [Petitioner] contends that the court abused its discretion by admitting expert testimony on CSAAS because: (1) [petitioner] did not challenge B.G.'s credibility
25 | based upon behavior or misconceptions that expert testimony about CSAAS would explain and therefore this evidence was irrelevant; (2) Dr. Urquiza's
26 | testimony was not limited to addressing specific misconceptions relevant to this

case; (3) the expert testimony improperly invited the jury to draw the conclusion that B.G. had been molested based upon behavior consistent with CSAAS; and (4) the probative value of this expert testimony was outweighed by the prejudicial effect, and therefore the court should have excluded it pursuant to section 352.

Expert testimony regarding CSAAS is "admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation. [Citations.] [¶] Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior." (People v. Patino (1994) 26 Cal.App .4th 1737, 1744-1745.)

[Petitioner's] contention that the court should have excluded the CSAAS evidence as irrelevant is premised upon the incorrect assertion that he did not place B.G.'s credibility in issue based upon paradoxical behavior. The record is to the contrary: [Petitioner's] counsel elicited B.G.'s testimony that before she finally reported the molestation, her mother and grandmother asked her whether anyone had touched her inappropriately and she did not tell them what [petitioner] had been doing. [Petitioner's] counsel also elicited B.G.'s testimony that after the molestation began she continued her relationship with [petitioner], and even asked him to give her backrubs. [Petitioner's] counsel also called [petitioner's] daughter-in-law to testify that B.G. constantly "badgered" [petitioner] to give her backrubs. In closing argument, [petitioner's] counsel relied on the foregoing testimony to argue that B.G was not credible "[b]ecause a person doesn't go back to a person who has molested them and ask them to molest them again." He also urged the jury to find her not credible because, rather than take the opportunity to disclose the molestation when her grandmother and mother asked whether anyone had touched her inappropriately, she lied to them and told them no one had. Dr. Urquiza's testimony regarding secrecy and delayed reporting and unconvincing disclosures was therefore highly relevant and admissible to dispel the myth that a child would immediately report abuse. His testimony regarding the components of helplessness, and entrapment and accommodation, was also admissible to dispel the misconception that an abused child would naturally avoid contact with her abuser, and to explain why and how an abused child might engage in the apparently paradoxical behavior of continuing a relationship with her abuser. (See, e.g., People v. Housley (1992) 6 Cal.App.4th 947, 955 [expert testimony on CSAAS was properly admitted to aid the jury in its assessment of the victim's delay in reporting the abuse and her last-minute recantation of the charges].)

Nor does the record support [petitioner's] assertion that Dr. Urquiza's testimony was not narrowly tailored to the purpose for which it was admissible. (See People v. Bowker (1988) 203 Cal.App.3d 385, 393-394 [to counteract the risk that a jury will improperly use CSAAS testimony to determine whether victim was molested "the evidence must be targeted to a specific 'myth' or 'misconception' suggested by the evidence"].) Dr. Urquiza did describe all five components of CSAAS, but only one of them, retraction, was not relevant to the issues in the case. To the extent reference to this component was overbroad, it was harmless because Dr. Urquiza did not elaborate on that component. His testimony instead focused primarily on the four components that were relevant to the jury's assessment of B.G.'s credibility, i.e., secrecy, helplessness, entrapment and accommodation, and

delayed and unconvincing reporting.

It is improper for an expert testifying on CSAAS to provide "testimony which recites either the facts of the case at trial or obviously similar facts," because such testimony can too easily be misunderstood by the jury as an invitation to use the CSAAS testimony to determine whether the victim was molested, or as offering an expert opinion that the victim is credible.  (People v. Gilbert (1992) 5 Cal.App.4th 1372, 1384.)  "[T]the line between impermissible use of expert testimony to prove the child was abused, and permissible use of such testimony to ' "explain the emotional antecedents of abused children's seemingly self-impeaching behavior ...." ' [citation] is by no means a bright one[;] the better practice is to limit the expert's testimony to observations concerning the behavior of abused children as a class and to avoid testimony which recites either the facts of the case at trial or obviously similar facts."  (Id. at pp. 1383-1384.)  [Petitioner] asserts that Dr. Urquiza's testimony crossed this line.  Yet, in each of the examples [petitioner] cites, [petitioner] failed to interpose any objection, and the CSAAS testimony was, in any event, sufficiently general to avoid being misused or misunderstood by the jury to determine whether she had, in fact, been molested.

In the first example [petitioner] cites, Dr. Urquiza testified that the perpetrator "is usually bigger or stronger and more in a position of authority than the child, who is ... smaller, younger and weaker."  [Petitioner] argues that this testimony crossed the line because B.G was in fact smaller and weaker than [petitioner], and [petitioner], as her step-grandfather, held a position of authority over her.  [Petitioner], however, did not interpose an objection, and even if he had, we would find this testimony to be unobjectionable because it is only generically applicable to the facts of any case involving continuous child sexual abuse.  Dr. Urquiza made this statement in the context of explaining why an abused child will keep the abuse a secret, to illustrate the point that the abuse typically takes place in the context of a relationship with a person the child knows, and that the relationship may itself be a source of coercion.  FN2  The examples of coercion he gave ranged from a direct threat, to more indirect coercion consisting of a sense of intimidation the child may have, based upon observation of how the abuser interacts with others.  He also noted that the source of coercion can arise from positive reinforcement such as bribes, or from conflicting feelings of love for, and desire to protect, the abuser.  Viewed in that context, the example Dr. Urquiza gave, that the abuser may also be physically stronger and hold a position of authority, was not likely to be misunderstood or misused by the jury as an indication that B.G. had in fact been abused by [petitioner].  (See People v. Harlan (1990) 222 Cal.App.3d 439, 450 [in context of explaining delayed disclosure, expert testimony was not improper simply because expert gave example that child will often not disclose until a crisis occurs, such as a divorce, despite the fact that child in that particular case had disclosed abuse during a divorce].)

FN2.  Dr. Urquiza noted that contrary to popular misconception, an abuser is not usually a stranger.  He was careful, however, not to state that the abuser is typically a relative, which, had a timely objection been interposed, might have come too close to mirroring the facts of this case.  Instead he testified that the abuser is "not likely to be a total stranger," and that more typically, "children are sexually abused by somebody with whom they have an ongoing relationship."  In context, it was clear that the point of this testimony was not to suggest that

because [petitioner] was B.G.'s relative it was more likely that he was her abuser. Instead, it was to make the more general point that the source of coercion need not be a direct threat, but may instead be perceived by the child in the context of an ongoing relationship with the abuser.

For similar reasons, we are not persuaded that the other examples [petitioner] cites crossed the line to become improper testimony mirroring the facts of this case. [Petitioner] objects to Dr. Urquiza's testimony that one reason disclosure may be delayed is that the "person who is molesting you" could be "a person you might normally ... disclose to."  He points out that [petitioner] as B.G.'s step-grandfather, would fall into the category of a person to whom she would normally disclose that she was being abused.  [Petitioner] also objects to Dr. Urquiza's testimony, in the context of explaining entrapment and accommodation, that children devise ways to cope and dissociate.  He argues this testimony too closely mirrored the facts of the case because B.G. "did not fight back, and was enduring and accommodating." Again we note that [petitioner] did not make any contemporaneous objection.  In any event, we find that in neither case did Dr. Urquiza's testimony veer from the proper description of common behavior of abused children as a class, to an improper factually specific description of the victim's behavior in this case.  In each of the foregoing excerpts, we are persuaded that what [petitioner] characterizes as objectionable linking of the CSAAS testimony to the specific facts of this case is, when read in context, nothing more than the minimal factual connection between these general behaviors, and the paradoxical behavior of B.G. that made CSAAS testimony relevant and admissible.  FN3

FN3.  We also note that the court sustained a timely objection when Dr. Urquiza's testimony did venture beyond general discussion of the components of CSAAS into more specific factual examples that were too closely related to the facts of the case.  For example, in the context of discussing the component of delayed reporting and disclosure, the court sustained a defense objection when Dr. Urquiza began to discuss a recent study quantifying how long it typically took for an abused child to report the abuse, and confined his testimony to simply conveying the more general principle that delays are common.

Moreover, no reasonable juror would interpret Dr. Urquiza's testimony as an expression of opinion as to B.G.'s credibility, or on the question whether she had been molested, because Dr. Urquiza testified that he had never met the victim, was unfamiliar with the facts of the case, and that he did not have, and it would not be proper for him to have, an opinion on the question whether the victim was molested.  He also explained how CSAAS is sometimes abused by prosecutors to prove abuse, and emphatically stated that this use is incorrect.  (See People v. Housley, supra, 6 Cal.App.4th at pp. 955-956 [expert's testimony that he had never met victim, and was unfamiliar with particular facts of case, rendered it unlikely that jury would consider CSAAS testimony for improper purpose].)

Finally, any danger that the jury might apply the components of CSAAS to conclude that the victim has been molested simply because she displays some of the behaviors addressed by the five components was also eliminated by instructing the jury that "the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true.  The jurors must understand that CSAAS research approaches the issue from a perspective opposite

11

to that of the jury.  CSAAS assumes a molestation has occurred and seeks to describe and explain common reactions of children to the experience.  [Citation.]  The evidence is admissible solely for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested."  (People v. Bowker (1988) 203 Cal.App.3d. 385, 394.)  The court in this case gave the jury standard instructions so limiting the use to which it could put the CSAAS evidence.

The court also acted within its discretion by declining [petitioner's] request to exclude the CSAAS evidence pursuant to section 352, and the admission of this evidence did not violate [petitioner's] due process rights.  As we have explained, the CSAAS evidence was relevant and admissible because B.G.'s credibility was in issue based upon her paradoxical behavior, consisting of initial denial of abuse, delayed disclosure, and actively initiating continued contact with her abuser.  The court was within its discretion to conclude that the potential prejudice [petitioner] identified, consisting of risk that the expert testimony would be misunderstood as an expert opinion or scientifically compelled conclusion that abuse had occurred, could be adequately addressed by appropriate limiting instructions, which it gave.  Both the prosecutor and [petitioner's] counsel also reminded the jury in closing argument that CSAAS testimony should not be used to determine whether the victim was in fact molested.  The prosecutor's argument relied on the CSAAS testimony only for the proper purpose of responding to [petitioner's] attacks on B.G.'s credibility based upon paradoxical behavior.

People v. Coates, 2008 WL 4788291 at *3-7.

As discussed in the state court opinion, CSAAS testimony is admissible for limited purposes pursuant to California law.  The Ninth Circuit has also upheld the admissibility of CSAAS in a habeas case noting that:

CSAAS testimony is admissible in federal child-sexual-abuse trials, when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth.  Although those cases did not address due process claims, both rejected the contention that CSAAS testimony improperly bolsters the credibility of child witnesses and precludes effective challenges to the truthfulness of their testimony-the very arguments that [petitioner Brodit] advances here.

Brodit v. Cambra, 350 F.3d 985, 991 (9th Cir. 2003) (internal citations removed); see also Lowe v. Walker, 2009 WL 1691597, at *5 (N.D.Cal. 2009) ("The Ninth Circuit has upheld the use of CSAAS evidence when, as in the instant case, it is used to show the general characteristics of victims and is used to opine that a specific child is telling the truth.").

In the instant case, a review of the record supports the state court opinion and demonstrates that the CSAAS testimony was properly allowed to provide possible reasons for the

1    inconsistences in the victim's reporting of the abuse.  The state court opinion describes the

2    testimony elicited from the victim by petitioner's counsel that justified the use of the CSAAS

3    testimony.  Even in closing arguments, petitioner's counsel further placed the victim's credibility

4    at issue, noting that the victim asked for a back rub from petitioner (Reporter's Transcript (RT) at

5    211) and admitted to lying when first denying there was any abuse (RT at 213-14).

6                  In addition, the trial court also instructed the jury with California Jury

7    Instructions-Criminal (CALJIC) 10.64, that states:

8          Evidence has been presented to you concerning Child Sexual Abuse
           Accommodation Syndrome. This evidence is not received and must not be
9          considered by you as proof that the alleged victim's molestation claim is true.

10         Child Sexual Abuse Accommodation Syndrome research is based upon an
           approach that is completely different from that which you must take to this case.
11         The syndrome research begins with the assumption that a molestation has
           occurred, and seeks to describe and explain common reactions of children to that
12         experience.  As distinguished from that research approach, you are to presume the
           defendant innocent.  The People have the burden of proving guilt beyond a
13         reasonable doubt.

14         You should consider the evidence concerning the syndrome and its effect only for
           the limited purpose of showing, if it does, that the alleged victim's reactions, as
15         demonstrated by the evidence, are not inconsistent with her having been molested.

16   RT at 247-47.

17                 Petitioner has failed to demonstrate that the state court holding is an unreasonable

18   application of federal authority.  The trial court properly allowed the CSAAS testimony for the

19   correct reasons and prevented the testimony from straying too far from the limited scope of the

20   CSAAS testimony.  Therefore, the admission of the evidence was not arbitrary or so prejudicial

21   that it rendered the trial fundamentally unfair.  This claim is denied.

22                 Claim 2 - Prior Bad Acts and § 1108

23                 Petitioner contends California Evidence Code § 1108 is unconstitutional and that

24   the trial court erred in admitting evidence of prior bad acts.

25                 Legal Standard

26                 "State court rulings on the admissibility of evidence generally fall outside the

13

1   scope of federal habeas relief, which is designed only to remedy violations of federal law."

2   Winzer v. Hall, 494 F.3d 1192, 1198 (9th Cir.2007).  The United States Supreme Court has

3   clearly established that "a state court's evidentiary ruling, even if erroneous, is grounds for

4   federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate

5   due process." Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir.1999) (citing, inter alia, Hill v.

6   United States, 368 U.S. 424, 428, 82 S.Ct. 468 (1962)).  In addition, "[a] successful petition for

7   collateral relief rooted in a claim of trial error must demonstrate actual prejudice, that is, a

8   'substantial and injurious effect or influence in determining the jury's verdict.'" Renderos v.

9   Ryan, 469 F.3d 788, 798 (9th Cir. 2006) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637, 113

10  S.Ct. 1710 (1993)).

11                  Discussion

12                  This claim was brought on direct appeal and denied in a reasoned opinion by the

13  court of appeal.

14          [Petitioner] next contends that section 1108 is unconstitutional on its face and as
            applied, and that the trial court abused its discretion by admitting the evidence of
15          the prior uncharged acts involving L.A. and J.P.

16          Procedural Background
            [Petitioner] objected to the prosecutor's motion in limine pursuant to section 1108
17          to permit introduction of [petitioner's] uncharged sexual conduct involving three
            victims, L.A., J.P., and T.H., on the grounds that the admission of this evidence
18          would violate [petitioner's] due process rights, and asked the court to exclude the
            evidence pursuant to section 352.
19
            The court ruled that section 1108 did not violate [petitioner's] due process rights.
20          It excluded the evidence concerning T.H. pursuant to section 352, but allowed the
            prosecutor to introduce the evidence concerning L.A and J.P.  The court reasoned
21          that the conduct involving L.A. and J.P. was not too remote, and it involved
            "similar behavior" that was "not horribly worse" than the charged offenses.  It
22          further noted that because [petitioner] had been punished for the uncharged
            offenses involving L.A. and J.P., there was no risk that the jury would believe he
23          had gotten "away with something."  The court excluded evidence of the conduct
            involving T .H. that had not resulted in a prosecution and conviction on the
24          ground that it was cumulative and "remote in time."

25          Facial Challenge to Constitutionality of Section 1108
            [Petitioner] raises his due process challenge to section 1108 only to preserve it for
26          possible review in the federal courts.  He acknowledges that the California

                                              14

Supreme Court, in <u>People v. Falsetta</u> (1999) 21 Cal.4th 903 (<u>Falsetta</u>), considered and rejected the contention that section 1108 violates state or federal constitutional principles of due process protection.  More recently, in <u>People v. Wilson</u> (2008) 44 Cal.4th 758 (<u>Wilson</u>), the court rejected a defendant's invitation "to reconsider the correctness" of its holding in <u>Falsetta</u>.  (<u>Wilson</u>, at p. 797.)  In <u>Wilson</u>, the court reaffirmed the reasoning of <u>Falsetta</u> that "although evidence of a criminal's propensity had long been excluded in this state, such 'long-standing practice does not necessarily reflect a fundamental, unalterable principle embodied in the Constitution' [citation], that a rule permitting admission of such evidence does not offend those fundamental due process principles [citation], and that 'the trial court's discretion to exclude propensity evidence under section 352 saves section 1108 from [the] defendant's due process challenge.' [Citation.]" (<u>Wilson</u>, at p. 797.)

This court is bound by our state Supreme Court's ruling in <u>Falsetta</u>, supra, 21 Cal.4th 903 and <u>Wilson</u>, supra, 44 Cal.4th 758.  We therefore summarily reject [petitioner's] contention that section 1108 is unconstitutional on its face.  (<u>Auto Equity Sales, Inc. v. Superior Court</u> (1962) 57 Cal.2d 450, 455.)

Failure to Exclude Evidence of Uncharged Sexual Acts Pursuant to Section 352
The trial court, when considering the admissibility of prior sexual conduct pursuant to section 1108, "must engage in a careful weighing process under section 352.  Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense."  (<u>Falsetta</u>, supra, 21 Cal.4th at p. 917.)

[Petitioner] argues that, in addition to excluding the evidence concerning T.H., the court should have excluded the evidence concerning L.A. and J.P, because it was "exceedingly inflammatory" and too remote.  The court was within its discretion to conclude, instead, that the conduct involving L.A. and J.P. was not particularly inflammatory relative to the charged offenses.  Although the contact with L.A. and J.P was more explicit and unambiguously sexual than the contact underlying the current charged offenses, both the charged and uncharged offenses involved sexual contact with minor girls.  In both the charged and uncharged offenses, [petitioner] touched a minor girl in private areas, while she was staying at the house he shared with his wife, when his wife was not present.  Each of the victims was a relative of [petitioner's] wife, and [petitioner] held a position of trust in relation to them.  The similarity of the prior offenses increased their probative value in proving [petitioner's] propensity to commit the charged offenses.  (<u>People v. Branch</u> (2001) 91 Cal.App.4th 274, 285 (<u>Branch</u>).)  This evidence was also highly probative and admissible on the issue of intent pursuant to section 1101, subdivision (b).

The uncharged offenses involving L.A. occurred in 1983, and the offenses

involving J.P. occurred in 1987.  There is no "bright line rule" as to when an uncharged offense is too remote.  (See People v. Harris (1998) 60 Cal.App.4th 727, 739.)  The courts have allowed evidence of uncharged sex offenses committed as much as 30 years earlier.  (Branch, supra, 91 Cal.App.4th at pp. 284-285.)  In deciding whether the uncharged conduct is too remote, the court may consider whether the defendant has since led a blameless life, because if he has, the prior conduct is arguably less probative on the issue of propensity and intent.  (Ibid. [in addition to having since lived a "blameless life," a "substantial gap between the prior offenses and the charged offenses means that it is less likely that the defendant had the propensity to commit the charged offenses"].)  Here, in addition to the evidence involving L.A. and J.P., the prosecutor sought to introduce evidence involving T.H. that began in 1988 and continued through 1992, just eight years prior to the charged offense, and was repeated again in 2002 when T.H. was 20 years old.  The prosecutor urged the court to allow evidence of uncharged conduct involving all three victims because it showed "continuous conduct" that did not end with the convictions for molesting L.A. and J.P. Although the court ultimately excluded the evidence involving T.H. on the ground, among others, that it was cumulative, FN4 the court could reasonably consider this pattern as a factor in weighing whether the conduct involving L.A. and J.P. was too remote, and was within its discretion to conclude that the conduct involving L.A. and J.P. was not too remote.

FN4.  The court also stated the conduct involving T.H. was "remote in time," which is puzzling because much of the conduct involving T .H. occurred during the same period or more recently than the conduct involving L.A. and J.P.  It is possible that the court misspoke, and that it meant instead to refer to fact that conduct involving T.H. was not sufficiently similar to balance out the remoteness factor, because T.H. was not a relative, and was much older when the most recent conduct occurred, and [petitioner] had not been convicted for conduct involving T.H.

Moreover, in Branch, supra, 91 Cal.App.4th 274, the court held remoteness, as a factor weighing against admission of uncharged conduct, may be "balanced out" by the increased probative value arising out of the degree of similarity between uncharged offenses and the charged offenses.  In Branch, the court upheld a trial court's decision to admit uncharged conduct that had occurred approximately 30 years earlier because, "the prior offenses and the current offenses were remarkably similar.  As noted by the trial court, [Branch] first molested a 12-year-old stepdaughter, then a 12-year-old step-great-granddaughter.  Moreover, [Branch] took advantage of the fact that each victim was staying in his home when the molestations took place.  Further, in an evident attempt to shield himself from being found out, he lied and told each victim's principal female caretaker that the victim had recently done something wrong.  In sum, the substantial similarities between the prior and the charged offenses balance out the remoteness of the prior offenses."  (Id. at p. 285; see also People v. Walker (2006) 139 Cal.App.4th 782, 807; People v. Pierce (2002) 104 Cal .App.4th 893, 900 [similarities between 23-year-old rape conviction and charged offense balanced out the remoteness of uncharged rape]; People v. Waples (2000) 79 Cal.App.4th 1389, 1395.)  The offenses involving L.A. and J.P. bore at least the same degree of similarity to the charged offenses as in Branch.

Another factor minimizing any prejudice and weighing in favor of admission of this evidence was that [petitioner] was prosecuted and convicted for the offenses involving L.A. and J.P.  "If the prior offense did not result in a conviction, that fact increases the danger that the jury may wish to punish the defendant for the uncharged offenses and increases the likelihood of confusing the issues 'because the jury [has] to determine whether the uncharged offenses [in fact] occurred.'"  (Branch, supra, 91 Cal.App.4th at p. 284.)  Those risks were not present here because [petitioner] was convicted of the offenses involving J.P. and L.A.

Based upon the foregoing factors, the court was within its discretion to find that evidence of [petitioner's] prior sexual misconduct involving J.P. and LA. was highly probative on the issue of intent and propensity, that the offenses were neither particularly inflammatory, nor too remote, and admission of this evidence would not confuse the jury or involve undue consumption of time, and to conclude the probative value of this evidence outweighed the danger of undue prejudice.

As Applied Challenge to Section 1108
[Petitioner] also contends that, even if not unconstitutional on its face, section 1108, as applied in this case, violated his due process rights to a fair trial.  This argument is closely related to the foregoing analysis concluding that the court properly exercised its discretion under section 352, because, the court, in Falsetta, supra, 21 Cal.4th at p. 917, held that "the trial court's discretion to exclude propensity evidence under section 352 saves section 1108 from [the] defendant's due process challenge."  "To show a violation of due process, a defendant must show that the statute, as applied, offended a principle of justice so rooted in the traditions and consciousness of the country that it is considered fundamental."  (People v. Manning (2008) 165 Cal.App .4th 870, 877.)  Where, as here, the court properly exercised its discretion under section 352, it is difficult to conceive of how application of section 1108 could have violated any such fundamental principle of due process.

To the extent [petitioner] argues that application of section 1108 violated due process because it allows the jury to draw an inference of propensity from the evidence of the prior sexual acts, the decision in Falsetta is dispositive.  The court held that although it was "unclear whether the rule against 'propensity' evidence in sex offense cases should be deemed a fundamental historical principle of justice ... [¶] ... even if the rule were deemed fundamental from a historical perspective, ... in light of the substantial protections afforded to defendants in all cases to which section 1108 applies, we see no undue unfairness in its limited exception to the historical rule against propensity evidence."  (Falsetta, supra, 21 Cal.4th at pp. 914-915.)

[Petitioner] also argues that the application of section 1108 violated his due process rights because the court in this case failed to limit the use of evidence of uncharged sexual misconduct to drawing an inference of propensity.  He suggests the jury therefore could have relied upon the prior sexual misconduct as direct evidence that he committed the charged offenses against B.G. even if it found the evidence did not establish beyond a reasonable doubt he was guilty of the charged offense.  The record does not support this contention.  The court instructed the jury on the limited purpose for which the prior uncharged conduct could be

17

1   considered, and specifically informed the jury that the prosecutor had the burden
    of proving the charged offenses beyond a reasonable doubt.  FN5 Consistent with
2   these instructions, the prosecutor's argument asked the jury only to draw an
    inference of "disposition," and an inference regarding intent.  The prosecutor also
3   explicitly reminded the jury that the evidence of prior sexual conduct alone was
    insufficient to prove the charged offenses and that the People still had to prove
4   what happened to B.G. beyond a reasonable doubt.

5   FN5.  We separately address [petitioner's] contention that the standard instruction
    the court gave permit a finding of guilt based upon a fact not proved beyond a
6   reasonable doubt in section III, post.

7   We therefore conclude that section 1108, as applied in this case, did not violate
    [petitioner's] state or federal due process rights.

8

9   People v. Coates, 2008 WL 4788291 at *7-10.

10          Petitioner has failed to demonstrate that § 1108 is unconstitutional or there was a

11  violation of his federal due process rights in the admission of the evidence.  California Evidence

12  Code § 1108 states in part: "In a criminal action in which the defendant is accused of a sexual

13  offense, evidence of the defendant's commission of another sexual offense or offenses is not

14  made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

15          There is no clearly established Supreme Court authority regarding the admission

16  of propensity evidence, in fact the Supreme Court specifically chose not to rule on the issue in

17  Estelle v. McGuire, 502 U.S. 62, 75 112 S.Ct. 475 (1991).  The Ninth Circuit addressed this

18  issue in Alberni v. McDaniel, 458 F.3d 860 (9th Cir. 2006):

19          "...The circumstances of this case are more like those present in Earp [v. Ornoski,
            431 F.3d 1158 (9th Cir.2005)], in which we declined to declare a constitutional
20          principle clearly established after the Supreme Court had expressly concluded the
            issue was an "open question."  Earp, 431 F.3d at 1185.  We held in Earp that "the
21          advent of AEDPA forecloses the option of reversing a state court determination
            because it conflicts with circuit law."  Id.  We cannot conclude that the Nevada
22          Supreme Court acted in an objectively unreasonable manner in concluding that the
            propensity evidence introduced against Mr. Alberni did not violate due process,
23          given that Estelle [v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385
            (1991) ], expressly left this issue an "open question." [¶]  The right Mr. Alberni
24          asserts has not been clearly established by the Supreme Court, as required by
            AEDPA..."

25

26  Alberni, 458 F.3d at 866-67.

1    The Ninth Circuit has ruled on the issue and found it does not violate due process.

2    In U.S. v. LeMay, 260 F.3d 1018, 1027 (9th Cir. 2001), cert. denied, 534 U.S. 1166, 122 S.Ct.

3    1181 (2002), the court found Federal Rule of Evidence § 414,[3] which governs the admissibility

4    of prior conduct in cases of child molestation, to be constitutional on its face.  Id.  The court

5    stated that the admission of propensity evidence "will only sometimes violate the constitutional

6    right to a fair trial, if it is of no relevance, or if its potential for prejudice far outweighs what little

7    relevance it might have."  Id.  The court determined that due process concerns were alleviated

8    because under Federal Rule of Evidence § 403, propensity evidence is excluded if its probative

9    value is substantially outweighed by the danger of unfair prejudice.  Id. at 1026, 1028.

10    The holding of LeMay is instructive in the instant case.  The operation of

11    California Evidence Code § 1108 in conjunction with California Evidence Code § 352 mirrors

12    that of Federal Rule of Evidence §§ 414 and 403, in that the state trial court is required to

13    exclude propensity evidence when its probative value is substantially outweighed by its

14    prejudicial effects.  Thus, the requirement under California Evidence Code § 352 to balance the

15    prejudicial effect of the evidence against its probative value ensures that evidence admitted under

16    § 1108 will not infringe on the right to a fundamentally fair trial guaranteed under the Due

17    Process Clause and is constitutional.  See LeMay, 260 F.3d at 1026-27.

18    Moreover, § 1108 was not improperly applied towards petitioner and the trial

19    court did not err in admitting this evidence.  Ultimately, petitioner has failed to demonstrate that

20    the admission of the evidence was so unduly prejudicial as to warrant habeas relief.  Petitioner

21    alleges that the evidence was so weak that the jury must have found petitioner guilty based on the

22    prior bad acts.  While the evidence that petitioner molested the victim in the instant case may not

23    have been overwhelming, petitioner has failed to show that the admission of the prior bad acts

24

25    [3] Federal Rule of Evidence § 414 states in relevant part: "In a criminal case in which the
defendant is accused of an offense of child molestation, evidence of the defendant's commission
of another offense or offenses of child molestation is admissible, and may be considered for its

26    bearing on any matter to which it is relevant."  The language of § 1108 is substantially similar.

1    was so prejudicial that it had a substantial and injurious effect in determining the jury's verdict.

2         As the state court noted, the prior bad acts were very similar to the facts of the

3    instant case.  Petitioner abused minor girls at the house he shared with his wife, the abuse

4    happened when the wife was not there, the girls were related to the wife and petitioner held a

5    position of trust with the girls.  All these factors support the trial court's decision to allow the

6    introduction of the evidence.  While these acts did occur more than twenty years prior to the

7    charged crimes, there is no established rule that prevents their use, and the trial court properly

8    ruled under § 352 that the nature and relevance of the acts outweighed the remoteness.

9         Thus, the state court ruling upholding the admission of the prior bad act testimony

10   was not contrary to established Supreme Court precedent and petitioner has failed to show that

11   the testimony had a substantial and injurious effect or influence in determining the jury's verdict.

12   These claims are denied.

13         Claim 3 - Jury Instructions

14         Petitioner alleges that the jury instructions allowed the jury to find him guilty by a

15   standard of proof less than beyond a reasonable doubt.

16         Legal Standard

17         A challenge to jury instructions does not generally state a federal constitutional

18   claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

19   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the

20   interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475 (1981);

21   see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d

22   1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to

23   deciding whether a conviction violated the Constitution, laws, or treaties of the United States

24   (citations omitted)." Estelle v. McGuire, 502 U.S. at 68, 112 S.Ct. at 480.  In order for error in

25   the state trial proceedings to reach the level of a due process violation, the error had to be one

26   involving "fundamental fairness." Id. at 73, 112 S.Ct. at 482.  The Supreme Court has defined

1   the category of infractions that violate fundamental fairness very narrowly.  Id. at 73, 112 S.Ct. at

2   482.

3   <u>Discussion</u>

4   Petitioner objects to the use of CALJIC Nos. 2.50.01, 2.50.1 and 2.50.2  This

5   claim was brought on direct appeal and denied in a reasoned opinion by the court of appeal.

6   With respect to the evidence of uncharged sex offenses, the court gave CALJIC
    Nos. 2.50.01, FN6, 2.50.1 and 2.50.2.  [Petitioner] contends that these instructions
7   could be understood to permit the jury to convict him based solely upon the
    evidence of the uncharged offenses, and to make the finding of guilt based upon a
8   preponderance of evidence rather than proof beyond a reasonable doubt, in
    violation of the due process clause of the California and United States
9   Constitutions.

10  FN6.  The trial court instructed the jury pursuant to CALJIC No. 2.50 .01 as
    follows: "Evidence has been introduced for the purpose of showing that the
11  defendant engaged in a sexual offense on one or more occasions other than that
    charged in the case.  [¶ ... ¶]  If you find that the defendant committed a prior
12  sexual offense, you may, but are not required to, infer that the defendant had a
    disposition to commit sexual offenses.  If you find that the defendant had this
13  disposition, you may, but are not required to, infer that he was likely to commit
    and did commit the crime, or crimes, of which he is accused.  [¶] ... [¶]  However,
14  if you find by a preponderance of the evidence that the defendant committed prior
    sexual offenses, that is not sufficient by itself to prove beyond a reasonable doubt
15  that he committed the charged crimes.  If you determine an inference properly can
    be drawn from this evidence, this inference is simply one item for you to consider,
16  along with all other evidence, in determining whether the defendant has been
    proved guilty beyond a reasonable doubt of the charged crimes."

17
    The California Supreme Court in <u>People v. Reliford</u> (2003) 29 Cal.4th 1007
18  (<u>Reliford</u>) rejected the same contention with respect to the 1999 version of
    CALJIC No. 2.50.01.  The Court held that "the 1999 version of CALJIC No.
19  2.50.01 correctly states the law" (<u>Reliford</u>, at p. 1009), and rejected the suggestion
    that the instruction was likely to mislead the jury regarding the prosecution's
20  burden of proof. (<u>Id</u>. at p. 1015.)  The Court also rejected an argument that
    "having found the uncharged sex offense true by a preponderance of the evidence,
21  jurors would rely on 'this alone' to convict him of the charged offenses.  The
    problem with [petitioner's] argument is that the instruction nowhere tells the jury
22  it may rest a conviction solely on evidence of prior offenses.  Indeed, the
    instruction's next sentence says quite the opposite: 'if you find by a preponderance
23  of the evidence that the defendant committed a prior sexual offense ..., that is not
    sufficient by itself to prove beyond a reasonable doubt that he committed the
24  charged crime.' "  (<u>Id</u>. at p. 1013.)

25  The <u>Reliford</u> court also approved the 2002 revised version of the instruction that
    was used by the court in this case.  This version instructs the jury "that the
26  inference they may draw from prior sexual offenses is simply one item to

21

consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime." (Reliford, supra, 29 Cal.4th at p. 1015.)  The court noted this sentence is not essential to the constitutionality of the instruction, but nonetheless described it as "an improvement," explaining that it "provides additional guidance on the permissible use of the other-acts evidence and reminds the jury of the standard of proof for a conviction of the charged offenses." (Id. at p. 1016.)  We must follow Reliford, and reject [petitioner's] contention that CALJIC No. 2.50.01 violates due process. (Auto Equity Sales, Inc. v. Superior Court, supra, 57 Cal.2d 450, 455.)

In his reply brief [petitioner] acknowledges that Reliford, supra, 29 Cal.4th 1007 is dispositive of his challenge to CALJIC No. 2.50.01, FN7 but suggests that the repetition of the preponderance of evidence standard in CALJIC Nos. 2.50.1 and 2.50.2 somehow renders it more likely that the jury would construe the instructions as permitting a finding of guilt based upon that lesser standard.  No such confusion is possible. CALJIC No. 2.50.2 merely defines the preponderance of the evidence standard.  Rather than suggest that the prosecution has a lesser burden of proof, CALJIC No. 2.50.1 *clarifies* that the preponderance of the evidence standard applies only to the determination whether the "defendant committed sexual offenses other than those for which he is on trial," and reminds the jury "that before a defendant can be found guilty of any crime charged ... the evidence as a whole, must persuade you *beyond a reasonable doubt* that the defendant is guilty of that crime."  (Italics added.)

FN7.  In his opening brief, [petitioner] had also relied on Gibson v. Ortiz (9th Cir.2004) 387 F.3d 812 (Gibson), to support his contention that CALJIC No. 2.50.01 and CALJIC No. 2.50.1, when read together, are unconstitutional.  Gibson is inapposite. The Gibson court reviewed a prior version of CALJIC No. 2.50.01, which lacked the cautionary language contained in the 2002 version given in this case and approved by Reliford, supra, 29 Cal.4th 1007.  (See Gibson, at pp. 817-819.)

We conclude that the instructions given correctly state the law, and comply with state and federal due process protections.

People v. Coates, 2008 WL 4788291 at *10-11.

Petitioner's claim is entirely frivolous and he has failed to demonstrate that the state court opinion is contrary to established Supreme Court authority.  The jury instructions clearly describe that petitioner must be found guilty beyond a reasonable doubt with respect to the charged crime.  Petitioner also relies on Gibson v. Ortiz, 387 F.3d 812 (9th Cir. 2004) in the instant petition, but as the court of appeal noted, the jury instruction found improper in that case was not the jury instruction used in this case.

Moreover, while the prior sexual conduct was uncharged with respect to the instant case, petitioner was found guilty of crimes related to that conduct in prior cases.  Thus, as

22

1   respondent notes, there is no concern that the jury used a preponderance of evidence standard, as

2   the prior conduct was found guilty beyond a reasonable doubt.  Mendez v. Knowles, 556 F.3d

3   757, 768-70 (9th Cir. 2009).

4            Finally, the trial court was clear elsewhere in the jury instructions that petitioner

5   must be found guilty beyond a reasonable doubt and the trial court explained the standard.  RT at

6   242.  For all these reasons, this claim is denied.

7            Claim 4 - Prior Strike

8            Petitioner asserts that the trial court abused its discretion by denying petitioner's

9   motion to strike a prior conviction.

10            Discussion

11            This claim was also denied in a reasoned opinion by the state court.

12   [Petitioner] next contends that the court abused its discretion by denying his
     motion to strike his prior strike conviction based upon [petitioner's] acts
13   involving L.A. and J.P.  The prior conviction was entered in 1987 after
     [petitioner] pleaded guilty to one count of violating Penal Code section 288,
14   subdivision (a).  The court suspended imposition of sentence for the 1987
     conviction and placed [petitioner] on probation on condition that he serve 90 days
15   in jail.

16   [Petitioner] asked the court to strike the 1987 prior because: (1) [petitioner] was
     61 years old and, even if sentenced only to the midterm, by the time he was
17   released he would have reached an age when it was not likely he would reoffend;
     (2) he had maintained steady employment for many years; (3) the current offenses
18   were nonviolent, and he had no other arrests or convictions; (4) the prior
     conviction was 20 years old, he had successfully completed probation and not
19   committed any other offensives; (4) he is a Marine Corps veteran who served two
     tours of duty in Vietnam, and is the recipient of several medals, including the
20   Purple Heart; (5) in 1995 he was diagnosed with non-Hodgkin's lymphoma, but
     was in remission at the time of sentencing; and (6) he had himself been subjected
21   to an incident of sexual abuse as a child.

22   The prosecutor argued that although the current offenses did not entail physical
     violence, they involved an abuse of trust and caused significant emotional and
23   psychological harm.  She noted that L.A. still visibly suffered emotionally when
     she was on the stand.  The prosecutor also contended that [petitioner's] age was
24   not a factor weighing in favor of granting a motion to strike, because [petitioner]
     had molested three victims over a 20-year period, and [petitioner] presented no
25   evidence that he would not be likely to commit new similar offenses because of
     his age.  The psychological evaluation submitted with the probation report
26   supported the contrary conclusion that [petitioner] presented a risk of harm to

                                            23

female children and adolescents because the pattern of crimes spanned a long time period, he denied the current offense, and he minimized the facts and consequences of his prior offenses.  The probation report also noted that despite participating in sex offender treatment, [petitioner] had reoffended.

After hearing argument, the court denied the motion.

"[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, 'in furtherance of justice' pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."  (People v. Williams (1998) 17 Cal.4th 148, 161.)  This court reviews a ruling on a motion to strike a prior conviction "under the deferential abuse of discretion standard."  (People v. Myers (1999) 69 Cal.App.4th 305, 309-310.)

In People v. Carmony (2004) 33 Cal.4th 367, the court explained that "a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances.  For example, an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss [citation]. Moreover, 'the sentencing norms [established by the three strikes law may, as a matter of law,] produce[ ] an "arbitrary, capricious or patently absurd" result' under the specific facts of a particular case.  [¶] But '[i]t is not enough to show that reasonable people might disagree about whether to strike one or more prior conviction allegations. [Citation.]  Where the record is silent ... or '[w]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance' [citation].  Because the circumstances must be 'extraordinary ... by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary.  Of course, in such an extraordinary case-where the relevant factors ... manifestly support the striking of a prior conviction and no reasonable minds could differ-the failure to strike would constitute an abuse of discretion." (Id. at p. 378.)

Our review of the record satisfies us that [petitioner] has not carried his burden of demonstrating the court abused its discretion.  (See Carmony, supra, 33 Cal.4th at pp. 379-380.)  The trial court carefully reviewed [petitioner's] criminal record, the nature of the current offenses, his prior performance on probation and parole, and made its decision to deny the motion to strike only after weighing the relevant factors and reaching a rational conclusions that [petitioner] did not fall outside the spirit of the three strikes sentencing scheme. [Petitioner] reargues all of the factors

he advanced in the trial court, and asserts that although the court "conscientiously considered" all of these factors it reached the wrong conclusion.  In effect, he asks this court to substitute its judgment for that of the trial court by weighing the positive factors he cites more heavily than the factors cited by the prosecution. This we cannot do.

The court was within its discretion to assign little weight to the fact that [petitioner's] prior conviction was 20 years old, because remoteness does not necessarily take a defendant outside the spirit of the three strikes law.  The three strikes law itself expressly rejects remoteness as a ground for avoiding its application.  It provides, "The length of time between the prior felony conviction and the current felony conviction shall not affect the imposition of sentence." (Pen.Code, § 667, subd. (c)(3).)  Nor is it an abuse of discretion to have assigned little weight to [petitioner's] age. "[M]iddle age, considered alone, cannot take a defendant outside the spirit of the law; otherwise, the very factor that takes a defendant within the spirit of the law-a lengthy criminal career with at least one serious or violent felony-would have the inevitable consequence-age-that would purportedly take him outside it."  (People v. Strong (2001) 87 Cal.App.4th 328, 332.)  Here, there was no factual basis to support [petitioner's] assertion that even if sentenced to the midterm he would not be likely to reoffend by the time he was released.  To the contrary, his impulses had not waned in the 20 years since the 1987 conviction, despite the experience of having been formally sanctioned once for precisely this type of criminal behavior, and the psychological reports suggested that he continued to pose a danger to adolescent females.

The court took into account the foregoing factors, and considered all of the other positive factors [petitioner] cited, but it clearly assigned more weight to the fact that [petitioner] had, over a period of 20 years, committed serious offenses against three young victims that caused tremendous emotional and psychological harm. Moreover, the prior punishment had not operated as a deterrent, and he repeated the same type of offense.  It therefore was within the court's discretion to conclude that [petitioner] was the type of recidivist to the three strikes law should apply, and to deny his motion to strike the 1987 conviction.

People v. Coates, 2008 WL 4788291 at *11-13.

The United States Supreme Court held in Lackawanna County District Attorney v. Coss, 532 U.S. 394, 121 S.Ct. 1567 (2001), that "once a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available .... the conviction may be regarded as conclusively valid.  If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained."  Lackawanna, 532 U.S. at 403-04.

In the instant case, petitioner does not challenge the validity of the prior strike,

25

1   rather he argues that the trial court abused its discretion in deciding not to strike the conviction.

2   It is well established that habeas corpus is unavailable for alleged error in the interpretation or

3   application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385

4   (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987).  As this is purely a matter of

5   state law, it is not cognizable on federal habeas review.  See Ely v. Terhune, 125 F. Supp.2d 403,

6   411 (C.D. Cal. 2000).  Even if this court could review this claim, it is abundantly clear that the

7   trial court did not abuse its discretion.  This claim is denied.

8           Accordingly, IT IS HEREBY ORDERED that:

9           1.  Petitioner's writ of habeas corpus is denied;

10          2.  A certificate of appealability is issued in this case regarding petitioner's claims

11  that: 1) Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence was improperly

12  admitted; and 2) California Evidence Code § 1108 violates due process and is unconstitutional

13  and the trial court abused its discretion is permitting the introduction of prior sexual offenses

14  pursuant to § 1108.

15  Dated: 02/03/2011

16                        /s/ Gregory G. Hollows

17                        UNITED STATES MAGISTRATE JUDGE

18  ggh:ab
   coat3499.hc

19

20

21

22

23

24

25

26